THE O'MARA LAW FIRM, P.C.
David C. O'Mara, Esq., 8955
311 E. Liberty Street
Reno, Nevada 89501
775.323.1321
david@omaralaw.net

Justin A. Kuehn, Esq. ([pro hac vice forthcoming])
Molly J. Brown, Esq. ([pro hac vice forthcoming])
KUEHN LAW, PLLC
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
Email: justin@kuehn.law; molly@kuehn.law

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ARTHUR PADILLA, derivatively and on behalf of BIOVIE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CUONG DO, JOSEPH PALUMBO, ROBERT HARIRI, STEVE GORLIN, JAMES LANG, SIGMUND ROGICH, and MICHAEL SHERMAN<br><br>Defendants,<br><br>and<br><br>BIOVIE, INC.,<br><br>Nominal Defendant. | Case No.: ____________________<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Arthur Padilla, by his undersigned attorneys, derivatively on behalf of Nominal Defendant BioVie, Inc. ("BioVie" or the "Company"), files this Verified Stockholder Derivative Complaint against Cuong Do ("Do"), Robert Hariri ("Hariri"), Steve Gorlin ("Gorlin"), James Lang ("Lang"), Sigmund Rogich ("Rogich"), Joseph Palumbo ("Palumbo"), and Michael Sherman ("Sherman") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of BioVie.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things: (a) Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BioVie, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and (b) public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the District of Nevada, *In re BioVie Inc. Securities Litigation*, Case No. 3:24-cv-00035-MMD-CSD (D. Nev.) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of BioVie against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from December 7, 2022 through at least November 29, 2023 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to BioVie and its shareholders,

including monetary losses and damages to BioVie's reputation and goodwill.

2. BioVie is a clinical-stage biopharmaceutical company focused on developing drug therapies for the treatment of neurological and neurodegenerative disorders, as well as advanced liver disease.

3. On August 5, 2021, BioVie initiated a Phase 3 clinical trial known as the NM101 study (the "Study" or "NM101") to evaluate its lead drug candidate, "NE3107." According to BioVie, NE3107 had the potential to be "an entirely new medical approach" for the treatment of Alzheimer's disease and Parkinson's disease. BioVie intended to use the Study to support a New Drug Application ("NDA") seeking marketing approval from the U.S. Food and Drug Administration ("FDA").

4. Throughout the Relevant Period, the Individual Defendants made, or caused BioVie to make, materially false and misleading statements regarding the NM101 Study, including, among other things, representations concerning the Study's patient enrollment status, target "completion" dates, and the quality and accuracy of the clinical data generated by the Study.

5. In December 2022, BioVie was required to undergo a "for-cause" audit at one of the NM101 Study's primary sites after members of the clinical trial staff identified evidence of patient data fraud. During the audit, third-party investigators uncovered, among other things, falsified medical history records and recommended that BioVie cease enrollment in the Study and close the site.

6. In August 2023, a second "for-cause" audit yielded substantially similar findings of additional fraudulent patient data. The resulting audit report identified deficiencies in the site's recordkeeping procedures that violated Good Clinical Practices ("GCPs"), as well as issues relating to missing testing information that undermined the credibility of the data collected. The

auditor further recommended additional investigation to determine the root cause of the missing data and/or the inability to validate data contained in patient files, and to confirm whether those patients were eligible for inclusion in the Study's final data analysis.

7. The truth began to emerge on November 8, 2023, when the Company filed its quarterly report with the SEC (the "1Q24 10-Q"), revealing that "during routine monitoring of blinded data from our Phase 3 study (NCT04669028) of NE3107, ***we uncovered what appears to be potential scientific misconduct and significant non-compliance with GCPs and regulation at six sites.***" The Company also admitted that "these ***findings of potential scientific misconduct and significant GCP violations may call into question the rigor, robustness and validity of the entire data set for this study*** (NCT04669028) and may require additional clinical studies to confirm the final results of the study." [1]

8. On this news, the Company's stock price declined by $3.03 per share, falling from a closing price of $4.99 per share on November 28, 2023 to close at $1.96 per share on November 29, 2023.

9. As set forth herein, throughout the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to the Company, made, or caused BioVie to make, materially false and misleading statements and omissions concerning, among other things: (i) patient enrollment in the NM101 Study; (ii) the expected timing of the Study's primary completion; (iii) optimism regarding blinded data; and (iv) risks associated with the clinical trial process. The Individual Defendants also failed to disclose material adverse facts necessary to make their statements not misleading. As a result, the Company's positive statements regarding its business,

[1] Emphasis added unless otherwise indicated.

operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

10. Moreover, one of the Individual Defendants breached his fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated by the Individual Defendants' false and misleading statements.

11. As a result of the foregoing, BioVie, its President and Chief Executive Officer ("CEO") and its Executive Vice President and Chief Medical Officer ("CMO") are named defendants in the Securities Action by investors who allege they were damaged when they purchased BioVie shares during the Relevant Period.

12. The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company. It will likely cost the Company millions of dollars.

13. On February 19, 2026, Plaintiff sent a letter to the BioVie Board of Directors (the "Board") demanding that the Board investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors ("Demand").[2] After receiving no response, Counsel for Plaintiff followed up on the Demand via email on March 10, 2026 (the "March 10, 2026 email").[3] After a series of communications and despite providing the Company with documentation showing that Plaintiff is a current shareholder of BioVie and has been at all relevant times, Plaintiff has not, to date,

[2] A true and complete copy of the Demand is attached hereto as Exhibit A.
[3] A true and complete copy of the March 10, 2026 email is attached hereto as Exhibit B.

received a substantive response to the Demand and demand in this case was refused.[4]

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the “Exchange Act”) over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC. Plaintiff’s claims also implicate a federal question to the extent they relate to the allegations set forth in the Securities Action, which is premised on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff’s state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts, omissions, transactions, and events giving rise to the claims asserted herein occurred in this District. Additionally, one or more of the Defendants resides in, maintains executive offices in, conducts business in, and/or caused harm that was felt within this District.

[4] True and complete copies of these communications, including a March 11, 2026 letter from BioVie requesting proof of ownership (the “March 11, 2026 letter”), a March 24, 2026 email from counsel for Plaintiff attaching proof of Plaintiff’s ownership (the “March 24, 2026 proof of ownership email”), and a May 5, 2026 letter from BioVie requesting further proof of ownership, are attached hereto as Exhibit C, Exhibit D, and Exhibit E respectively.

## PARTIES

### Plaintiff

18. Plaintiff is a current shareholder of BioVie and has been at all relevant times, a shareholder of BioVie.

### Nominal Defendant

19. Nominal Defendant BioVie is incorporated under the laws of Nevada, with its principal executive office located at 680 W Nye Lane, Suite 204, Carson City, Nevada 89703. BioVie's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "BIVI."

### Individual Defendants

***Director Defendants***

**Defendant Do**

20. Defendant Do has served as CEO and President of the Company since April 2021, and as a member of BioVie's Board of Directors since 2016. Do is a named defendant in the Securities Action.

21. The Company's 2025 Proxy Statement that was filed with the SEC on September 25, 2025 (the "2025 Proxy") stated the following about Defendant Do:

> **Mr. Cuong Do** has served on the Company's Board of Directors since 2016 and was appointed the Company's Chief Executive Officer ("CEO") and President in 2021. He previously served as President, Global Strategy Group at Samsung from 2015 to 2020. Mr. Do helped set the strategic direction for Samsung's diverse business portfolio. Prior to that, he was the Chief Strategy Officer for Merck from 2011 to 2014, Tyco Electronics from 2009 to 2011, and Lenovo from 2007 to 2009. Mr. Do is a former senior partner at McKinsey & Company, where he spent 17 years and helped build the healthcare, high tech and corporate finance practices. He holds a BA from Dartmouth College, and an MBA from the Tuck School of Business at Dartmouth.

22. According to the Proxy Statements filed by the Company in 2022 and 2023, Defendant Do received total compensation of $4,542,821 and $2,337,668, respectively.

| FISCAL YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|---|
| **2023** | 618,000 | 463,500 | 734,668 | 521,500 | 2,337,668 |
| **2022** | 300,000 | 400,000 | 210,439 | 3,632,382 | 4,542,821 |

23. As of September 13, 2022, Defendant Do beneficially owned 521,241 shares of BIVI common stock, and based on BIVI's stock price of $2.61 per share on that date, Do's holdings were valued at approximately $1,360,439. On August 9, 2023, Do beneficially owned 738,312 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Do's holdings were valued at approximately $2,739,138. By September 30, 2024, Defendant Do beneficially owned 123,927 shares of BIVI common stock and based on BIVI's stock price of $1.20 per share on that date, Do's holdings were valued at approximately $148,712.

**Defendant Lang**

24. Defendant Lang has been a member of the Company's Board of Directors since December 2016. Lang has served as Chairman of the Board since March 2023, and currently serves as Chair of the Board's Audit Committee and as a member of the Compensation Committee.

25. The Company's 2025 Proxy stated the following about Defendant Lang:

> **Mr. James Lang**, Chairman of the Board of Directors since 2023 and has served as the Company's director since 2016. He is currently CEO of EVERSANA, the leading commercialization services company for the life sciences industry. In five years since he founded EVERSANA, it is now over $1B in revenue, with more than 7,000 employees across 40 global locations. He formerly served as the CEO of Decision Resources Group (DRG), which he transformed into a leading healthcare data and analytics firm. Prior to that, Jim was CEO of IHS Cambridge Energy Research Associates (IHS CERA), a recognized leader in energy industry subscription information products, and formerly the President of Strategic Decisions Group (SDG), a leading global strategy consultancy. Mr. Lang holds a

> BS summa cum laude in electrical and computer engineering from the University of New Hampshire and an MBA with Distinction from the Tuck School of Business. Jim Lang currently also serves as a Director at OptimizeRX (OPRX), a Nasdaq listed Company.

26. According to the Proxy Statements filed by the Company in 2022 and 2023, Defendant Lang received total compensation of $417,906.86 and $266,697, respectively.

| FISCAL YEAR | STOCK AWARDS ($) | OPTION AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 266,697 | | 266,697 |
| **2022** | | 417,907 | 417,907 |

27. As of September 13, 2022, Defendant Lang beneficially owned 126,252 shares of BIVI common stock and based on BIVI's stock price of $2.61 per share on that date, Lang's holdings were valued at approximately $329,518. On August 9, 2023, Lang beneficially owned 170,570 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Lang's holdings were valued at approximately $632,815. By September 30, 2024, Defendant Lang beneficially owned 35,937 shares of BIVI common stock and based on BIVI's stock price of $1.20 per share on that date, Lang's holdings were valued at approximately $43,124.

**Defendant Rogich**

28. Defendant Rogich has been a member of the Company's Board of Directors since June 2020. Rogich currently serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

29. The Company's 2025 Proxy stated the following about Defendant Rogich:

> **Mr. Sigmund Rogich** has served as a director of the Company since 2020. He is the CEO and President of The Rogich Communications Group and serves on the Board of Keep Memory Alive, a philanthropic organization which raises awareness about brain disorders and Alzheimer's disease. Keep Memory Alive funds clinical trials to advance new treatments for patients with Alzheimer's, Huntington's and Parkinson's disease, as well as multiple sclerosis. Mr. Rogich was formerly the U.S. Ambassador to Iceland. He has served as a senior consultant to Presidents Ronald

> Reagan and George H.W. Bush. Mr. Rogich serves on multiple boards of directors for charitable causes.

30. According to the Proxy Statements filed by the Company in 2022 and 2023, Defendant Rogich received total compensation of $403,203.33 and $223,300, respectively.

| **FISCAL YEAR** | **STOCK AWARDS ($)** | **OPTION AWARDS ($)** | **TOTAL ($)** |
|---|---|---|---|
| **2023** | | 223,300 | 223,300 |
| **2022** | | 403,203 | 403,203 |

31. As of September 13, 2022, Defendant Rogich beneficially owned 79,500 shares of BIVI common stock and based on BIVI's stock price of $2.61 per share on that date, Rogich's holdings were valued at approximately $207,495. On August 9, 2023, Rogich beneficially owned 145,075 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Rogich's holdings were valued at approximately $538,228. By September 30, 2024, Defendant Rogich beneficially owned 28,711 shares of BIVI common stock and based on BIVI's stock price of $1.20 per share on that date, Rogich's holdings were valued at approximately $34,453.

**Defendant Sherman**

32. Defendant Sherman has been a member of the Company's Board of Directors since 2017. Sherman currently serves as the Chair of the Compensation Committee and is also a member of the Audit Committee and the Nominating and Corporate Governance Committee.

33. The Company's 2025 Proxy stated the following about Defendant Sherman:

> **Mr. Michael Sherman** has served as a director of the Company since 2017. He retired from his position as a Managing Director at Barclays Plc in 2018, where he had worked since 2008. Previously he was a Managing Director at Lehman Brothers, Inc. He has worked in investment banking for 30 years. Mr. Sherman has significant experience in healthcare finance, most recently assisting on a $450 million convertible transaction for Neurocrine Biosciences. He has worked on successful financial transactions for Teva Pharmaceutical Industries, Amgen Inc.,

Cubist Pharmaceuticals, Merck & Co., and Cardinal Health, among other companies. After graduating from the University of Pennsylvania, Michael Sherman received his JD, cum laude, from the Harvard Law School.

34. According to the Proxy Statements filed by the Company in 2022 and 2023, Defendant Sherman received total compensation of $425,258.62 and $304,500 in fiscal years 2022 and 2023, respectively.

| **FISCAL YEAR** | **OPTION AWARDS ($)** | **TOTAL ($)** |
|---|---|---|
| **2023** | 304,500 | 304,500 |
| **2022** | 425,259 | 425,259 |

35. As of September 13, 2022, Defendant Sherman beneficially owned 121,299 shares of BIVI common stock and based on BIVI's stock price of $2.61 per share on that date, Sherman's holdings were valued at approximately $316,590. On August 9, 2023, Sherman beneficially owned 202,525 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Sherman's holdings were valued at approximately $751,368. By September 30, 2024, Defendant Sherman beneficially owned 38,695 shares of BIVI common stock and based on BIVI's stock price of $1.20 per share on that date, Sherman's holdings were valued at approximately $46,434.

**Defendant Gorlin**

36. Defendant Gorlin served as a member of the Company's Board of Directors from June 2020 until his resignation on July 25, 2024.

37. According to the Proxy Statements filed by the Company in 2022 and 2023, Defendant Gorlin received total compensation of $399,445.76 and $209,549 in fiscal years 2022 and 2023, respectively.

| FISCAL YEAR | STOCK AWARDS ($) | OPTION AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 209,549 | | 209,549 |
| **2022** | | 399,446 | 399,446 |

38. As of September 13, 2022, Defendant Gorlin beneficially owned 128,713 shares of BIVI common stock and based on BIVI's stock price of $2.61 per share on that date, Gorlin's holdings were valued at approximately $335,941. On August 9, 2023, Gorlin beneficially owned 178,468 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Gorlin's holdings were valued at approximately $662,116.

39. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was uncovered, Defendant Gorlin executed the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| **9/5/2023** | 8,560 | 3.05 | 26,108 |
| **TOTAL** | 8,560 | | 26,108 |

**Defendant Hariri**

40. Defendant Hariri served as a member of the Company's Board of Directors from June 2020 until his resignation effective March 28, 2025. During his tenure, Hariri served as a member of the Board's Nominating and Corporate Governance Committee.

41. According to the Proxy Statements filed by the Company in 2022 and 2023, Defendant Hariri received total compensation of $399,445.76 and $209,549, respectively.

| FISCAL YEAR | STOCK AWARDS ($) | OPTION AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 209,549 | | 209,549 |
| **2022** | | 399,446 | 399,446 |

42. As of September 13, 2022, Defendant Hariri beneficially owned 78,513 shares of BIVI common stock and based on BIVI's stock price of $2.61 per share on that date, Hariri's holdings were valued at approximately $204,919. On August 9, 2023, Hariri beneficially owned 119,895 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Hariri's holdings were valued at approximately $444,810. By September 30, 2024, Defendant Hariri beneficially owned 26,408 shares of BIVI common stock and based on BIVI's stock price of $1.20 per share on that date, Hariri's holdings were valued at approximately $31,690.

43. Defendants Do, Lang, Rogich, Sherman, Gorlin, and Hariri are herein referred to as the "Director Defendants."

***<u>Officer Defendants</u>***

**Defendant Palumbo**

44. Defendant Palumbo has served as the Executive Vice President, Head of Research & Development, and CMO since November 2021. Palumbo is a named defendant in the Securities Action.

45. The Company's 2025 Proxy stated the following about Defendant Palumbo:

> **Dr. Joseph M. Palumbo** has served as our Chief Medical Officer ("CMO") since 2021. Formerly he served as the CMO at Zynerba Pharmaceuticals from July 2019 to October 2021, responsible for clinical operations, development, regulatory, and medical affairs. Prior to his time at Zynerba, Dr. Palumbo held senior worldwide governance roles at Mitsubishi Tanabe Pharma in both the United States and Japan

> from April 2012 to June 2019, where he led medical science and translational research across multiple therapeutic areas, and guided successful registrational programs for Radicava® (edaravone) for the treatment of Amyotrophic Lateral Sclerosis. From April 2003 to March 2012, Dr. Palumbo was Global Head and Franchise Medical Leader for Psychiatry, and the Interim Head of Global Neuroscience at Johnson & Johnson, where he led the medical teams who achieved successful global registrations for Risperdal® (risperidone); Concerta® (methylphenidate HCL); and Invega® (paliperidone). He was Head of Psychiatry and Neurology at Pharmanet for from April 2002 to April 2003. Dr Palumbo previously held industry positions in European Pharma with Sanofi-Synthelabo from April 1999 to April 2002, Biotech at Cephalon, from April 1997 to April 1998, and from July 1989 to April 2002, he held senior leadership and hospital administration roles at prestigious academic research institutions including Yale, Cornell, and the University of Pennsylvania. He holds a Bachelor of Arts at the University of Pennsylvania and received his Doctor of Medicine at the George Washington University School of Medicine. He was a Biological Sciences Training Program Fellow of the National Institutes of Health and Chief Resident for the Abraham Ribicoff Clinical Neuroscience Research Unit at Yale University. Dr Palumbo has received Board Certification in Psychiatry and Addiction Psychiatry.

46. As of September 13, 2022, Defendant Palumbo beneficially owned 24,883 shares of BIVI common stock and based on BIVI's stock price of $2.61 per share on that date, Palumbo's holdings were valued at approximately $64,945. On August 9, 2023, Palumbo beneficially owned 38,263 shares of BIVI common stock and based on BIVI's stock price of $3.71 per share on that date, Palumbo's holdings were valued at approximately $141,956. By September 30, 2024, Defendant Palumbo beneficially owned 21,703 shares of BIVI common stock and based on BIVI's stock price of $1.20 per share on that date, Palumbo's holdings were valued at approximately $26,044.

***Non-Party Members***

**Dr. Amy Chappell**

47. Dr. Amy Chappell has served as a member of the Company's Board of Directors since 2025. Dr. Chappell is a member of the Nominating and Corporate Governance Committee.

48. The Company's 2025 Proxy stated the following about Dr. Chappell:

> **Dr. Amy Chappell** has served as a director of the Company since 2025. Since 2024, she has served as CMO of Solaxa Inc., where she oversees clinical development of novel therapies for ataxia and nerve repair. Prior to that, Dr. Chappell was a clinical trials and neurology consultant for various companies from 2021 to 2024. From 2020 to 2021, she was CMO of Eliem Therapeutics, assisting it through a successful initial public offering and advancing programs in epilepsy and mood disorders. Dr. Chappell has also served over 25 years at Eli Lilly & Co., where she played a central role in developing and gaining US Food and Drug Administration (FDA) approvals for multiple central nervous system indications, including for Cymbalta® in fibromyalgia and musculoskeletal pain. Dr. Chappell holds a BA from Antioch College and an MD from Indiana University School of Medicine. She also holds numerous patents, has authored over 100 peer-reviewed publications and presentations, and remains a Fellow of the American Academy of Neurology.

**Kameel Farag**

49. Mr. Kameel Farag has served as a member of the Company's Board of Directors since 2025. Mr. Farag is a member of the Audit Committee.

50. The Company's 2025 Proxy stated the following about Mr. Farag:

> **Mr. Kameel Farag** has served as a director of the Company since 2025. Most recently, he was Chief Financial Officer, Treasurer and head of business operations at Aspen Neuroscience from 2021 to 2025, where he oversaw tripling the company's headcount, secured over $150 million in financing, built manufacturing infrastructure and prepared the company for clinical data and a potential future public offering. Prior to that, he served as Senior Vice President, Finance at Ionis Pharmaceuticals from 2018 to 2021. In addition, Mr. Farag spent over 16 years at Amgen Inc. in a variety of finance and operational roles including Chief Financial Officer of Amgen's Intercontinental Region from 2013 to 2018 and as its Head of International FP&A and Interim International Chief Financial Officer from 2009 to 2013. Mr. Farag holds a BA from the University of California, Santa Barbara.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

51. By reason of their positions as officers, directors, and/or fiduciaries of BioVie, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed BioVie and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

52. The Individual Defendants were and are required to use their utmost ability to

control and manage BioVie in a fair, just, honest, and equitable manner.

53. The Individual Defendants were and are required to act in furtherance of the best interests of BioVie and its shareholders to benefit all shareholders equitably.

54. Each director and officer of the Company owes BioVie and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

55. As fiduciaries of BioVie, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

56. The officers and directors of BioVie were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

57. Each Individual Defendant, by virtue of their position as officers and directors of BioVie, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

58. As BioVie's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

59. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

60. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

61. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) Ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

(b) Ensure the Company operated diligently, honestly, and prudently, in full compliance with all applicable federal and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

(c) Ensure that communications with the public and shareholders were timely, complete, and made with candor; and

(d) Upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

62. Each of the Individual Defendants also bore a duty of loyalty to BioVie and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

63. During the pertinent times, the Individual Defendants served as agents for each other and for BioVie, always operating within the parameters of their agency.

64. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within BioVie, were privy to detrimental, confidential information concerning the Company.

## CODE OF CONDUCT AND ETHICS OF BIOVIE INC.

65. In addition to the fiduciary duties enumerated above, the Individual Defendants are required to comply with BioVie's Code of Conduct and Ethics, which states that all directors are "expected to be familiar with this Code and to adhere to the principles and procedures set forth in this Code."

66. Regarding the responsibilities of the Individual Defendants, the Code of Conduct specifies in relevant part:

> The Board of Directors of BioVie Inc. (the "Company") has adopted this Code of Ethics (this "Code") to provide value for our shareholders; and
>
> - To encourage honest and ethical conduct, including fair dealing and the ethical handling of conflicts of interest;
> - To prompt full, fair, accurate, timely and understandable disclosure;
> - To comply with applicable laws and governmental rules and regulations;
> - To prompt internal reporting of violations of this Code;
> - To protect the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and
> - To deter wrongdoing.
>
> All directors, officers, employees and independent contractors of the Company are expected to be familiar with this Code and to adhere to the principles and procedures set forth in this Code. For purposes of this Code, all directors, officers, employees and independent contractors are referred to collectively as "employees" or "you" throughout this Code.
>
> **1. Honest and Ethical Conduct**
>
> All directors, officers, employees and independent contractors owe duties to the Company to act with integrity. Integrity requires, among other things, being honest and ethical. This includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Deceit and subordination of principle are inconsistent with integrity.
>
> All directors, officers, employees and independent contractors have the following duties:

- To conduct business with professional courtesy and integrity, and act honestly and fairly without prejudice in all commercial dealings;
- To work in a safe, healthy and efficient manner, using skills, time and experience to the maximum of abilities;
- To comply with applicable awards, Company policies and job requirements, and adhere to a high standard of business ethics;
- To observe both the form and spirit of laws, governmental rules, regulations and accounting standards;
- Not to knowingly make any misleading statements to any person or to be a party to any improper practice in relation to dealings with or by the Company;
- To ensure that Company resources and properties are used properly;
- To maintain the confidentiality of information where required or consistent with Company policies; and
- Not to disclose information or documents relating to the Company or its business, other than as required by law, not to make any unauthorized public comment on Company affairs and not to misuse any information about the Company or its associates, and not to accept improper or undisclosed material personal benefits from third parties as a result of any transaction or transactions of the Company.

* * *

**IV. Compliance**

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations in the performance of their duties for the Company, including those relating to accounting and auditing matters and insider trading.

The Board endeavors to ensure that the directors, officers and employees of the Company act with integrity and observe the highest standards of behavior and business ethics in relation to their corporate activities.

Specifically, directors, officers and employees must:

- Comply with the law;

- Act in the best interests of the Company;
- Be responsible and accountable for their actions; and
- Observe the ethical principles of fairness, honesty and truthfulness, including disclosure of potential conflicts.

* * *

**IX. Protection and Proper Use of Company Assets**

All employees, officers and directors should protect the Company's assets and ensure their efficient use. All Company assets should be used only for legitimate business purposes. Theft, carelessness and waste have a direct impact on our profit.

* * *

**<u>NOMINATING AND CORPORATE GOVERNANCE COMMITTEE CHARTER</u>**

67. Director Defendants have additional fiduciary duties as described in BioVie’s Nominating and Corporate Governance Committee Charter, which was established “to help ensure that the Board is properly constituted to meet its fiduciary obligations to stockholders and the Company and that the Company has and follows appropriate corporate governance practices and standards.”

68. Regarding the role of the Board, the Charter states, in pertinent part, the following:

* * *

*Corporate Governance Generally*

- Develop and recommend to the Board a set of corporate governance principles and practices.
- Review annually the Company's corporate governance principles and practices, the Company's compliance with these principles and practices, and recommend changes, as appropriate.

- Oversee the Company's communications and relations with stockholders.
- Oversee the evaluation of the Company's management.
- Oversee, review and report to Board regarding the Company's succession planning for the Board, senior management and other key employees.
- Periodically review and reassess the adequacy and scope this Charter and the Committee's established processes and procedures and recommend any proposed changes to the Board for approval.
- Oversee the Board's performance and self-evaluation process, including conducting surveys of director observations, suggestions and preferences regarding how effectively the Board operates.
- Oversee compliance by the Board and its committees with applicable laws and regulations, including the stock exchange rules and regulations and SEC rules and regulations.
- Review annually the performance of the Committee.

## BIOVIE'S AUDIT COMMITTEE CHARTER

69. In addition to the duties above, under the Company's Audit Committee Charter, as members of the Audit Committee during the Relevant Period, Defendants Lang (Current Chair) and Sherman (collectively the "Audit Committee Defendants") owed specific additional duties to BioVie. Pursuant to the Charter, the purpose of the Audit Committee is as follows:

**PURPOSE**

The purpose of the Audit Committee shall be to represent and assist the Board in the oversight and monitoring of:

- The Company's accounting and financial reporting processes and the audits of the Company's financial statements;
- The integrity of the Company's financial statements;

- The Company' s internal accounting and financial controls; and

- The Company's compliance with legal and regulatory requirements, and the independent auditors' qualifications, independence and performance.

* * *

**COMMITTEE AUTHORITY AND RESPONSIBILITIES**

* * *

**Financial Statements and Disclosure Matters**

- Discuss and, as appropriate, review with management and the independent auditors the Company' s financial statements and annual and quarterly reports, including the Company' s disclosures under Management' s Discussion and Analysis of Financial Condition and Results of Operations, discuss with the independent auditors any other matters required to be discussed by accounting and auditing standards, and recommend to the Board whether the audited financial statements should be included in the Company's annual report.

- Discuss with management, the internal auditor and the independent auditors significant financial reporting issues raised and judgments made in connection with the preparation of the Company's financial statements, including the review of (i) major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company’s selection or application of accounting principles; (ii) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues raised and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP or IFRS methods on the financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet arrangements, on the Company' s financial statements; and (iv) the type and presentation of information be included in earnings press releases, as well as any financial information and earnings guidance to be provided to analysts and rating agencies.

- At least annually, obtain and review a report by the independent auditor describing: (i) the audit firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or (iii) by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the audit firm, and any steps taken to deal with any such issues described in the report.

- Receive, review and discuss quarterly reports from the independent auditors on (i) the Company's major critical accounting policies and practices; (ii) significant alternative treatments of financial information within GAAP or IFRS that have been discussed with management; (iii) ramifications of the use of such alternative disclosures and treatments; (iv) any treatments preferred by the independent auditors; and (v) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

- Review on a regular basis with the Company' s independent auditors any problems or difficulties encountered by the independent auditors in the course of any audit work, including management' s response with respect thereto, any restrictions on the scope of the independent auditors' activities or on access to requested information, and any significant disagreements with management; and ensure the resolution of any disagreements between management and the independent auditors regarding financial reporting.

- Review disclosures regarding the Company's internal controls that are required to be included in SEC reports.

- Discuss with management and independent auditors any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with management earnings press releases and financial information and earnings guidance to be provided to analysts and rating agencies, including any proposed use of "pro forma" or "adjusted" non- GAAP and non-IFRS information.

**Oversight of the Company's Internal Control Function**

- Review the adequacy and effectiveness of the Company's internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit and control function, as well as the need for any special audit procedures in response to material control deficiencies, through inquiry and discussions with the Company' s independent auditors and management.

- Review the reports prepared by management, assessing the adequacy and effectiveness of the Company' s internal controls and procedures, prior to the

inclusion of such reports in the Company's periodic filings as required under SEC rules.

* * *

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

71. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

72. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

73. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of BioVie, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

74. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or

should have been, aware of his or her overall role in furthering the misconduct.

75. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of BioVie, and at all times operated within the course and scope of that agency.

**FACTUAL BACKGROUND**

76. In June 2021, BioVie acquired its lead drug candidate, NE3107, from NeurMedix, Inc., an affiliated biopharmaceutical company.

77. On August 5, 2021, BioVie announced the enrollment of the first patient in the NM101 "pivotal" Phase 3 clinical study evaluating NE3107 as a treatment for Alzheimer's disease. According to FDA clinical trial procedures, a "pivotal" study is the study upon which a sponsor, or drug company, principally relies in support of an NDA seeking marketing approval from the FDA. BioVie further represented that the Study "aims to have data readout by the end of 2022."

78. The Company described the Study as a randomized, double-blind, placebo-controlled, U.S. multicenter study of NE3107 involving 316 subjects with mild to moderate Alzheimer's disease. In addition to evaluating conventional cognition, memory, functional, behavioral, and imaging endpoints, NM101 was designed to assess measures of glycemic control, brain glucose utilization, and systems dysregulation.

79. As the sponsor of the Study, BioVie retained a third-party contract research organization ("CRO") to manage the clinical sites and monitor compliance at those sites. Each clinical site was responsible for uploading its blinded data to an electronic database ("EDC") maintained by BioVie's CRO, the Cognitive Research Corporation.

80. On July 22, 2022, Cantor Fitzgerald issued a report initiating coverage of BioVie

with an "overweight" rating and a $7 price target. While identifying NE3107 as a "potential blockbuster opportunity," the report expressed caution regarding the Company's development strategy and reduced its projected probabilities of success accordingly. The report explained that "BioVie has not conducted dose-ranging studies for its neuro programs. As such, we view the 20mg twice a day dose being used in the ongoing studies as a bit of a 'dart throw,' and we remain uncertain as to whether this is an optimal dose." The report also raised concerns regarding the NM101 Study's screening procedures designed to ensure enrollment of patients with neuroinflammation or insulin resistance, as well as the shortened duration of the Study, concluding that "[a]lthough we applaud management's efforts to be capital-efficient, we are concerned that this is coming at a cost to scientific rigor."

81. By September 2022, BioVie had enrolled approximately 150 patients in the NM101 Study and was preparing for a scheduled late-2022 review of the Study by its data safety monitoring board, or "DSMB."

82. On December 7, 2022, BioVie filed a Current Report on Form 8-K with the SEC announcing that it would forgo the interim DSMB analysis and instead increase enrollment to 400 patients. The Company cited the fact that it had completed enrollment of all 316 patients initially targeted before 50% of patients completed the Study.

83. During the fall of 2022, concerns began to emerge regarding potential misconduct at one of NM101's principal study sites, Site No. 145 in Cutler Bay, Florida. By December 2022, Site No. 145 was subject to an "enrollment hold," indicating that the Study's principal investigator and/or BioVie had determined that concerns regarding potential misconduct warranted a pause in the registration of new patients. As a result of these concerns, BioVie was forced to undergo a "for-cause" audit. In the clinical-trial context, a for-cause audit

is an investigation into a specific problem that has come to either the FDA's attention or the attention of the study's investigator or sponsor.

84. Third-party auditor Pitts Quality Consulting conducted the audit of Site No. 145 on December 28 and 29, 2022 (the "Pitts Audit"). The Pitts Audit determined that Site No. 145's level of compliance was unacceptable, due in part to evidence of potential misconduct. Among other issues, Pitts auditors identified protocol-compliance deficiencies, including that the eligibility of subjects participating in the NM101 Study could not be confirmed because of concerns regarding the data integrity of patient medical-history records. The auditors also found that patient testing was not being administered uniformly because different individuals were evaluating patient responses using different languages. In addition, the Pitts Audit identified further protocol violations, including the enrollment of a site employee's family member without institutional review board approval and the failure to translate testing materials provided to patients who required translations.

85. With respect to documentation issues, the Pitts Audit identified data-integrity concerns and irregularities involving the medical histories of several subjects. The audit found that certain patient medical records appeared to have been falsified in a manner that rendered patients "eligible" for the NM101 Study when they otherwise would not have qualified. The Pitts Audit further observed that portions of text within the electronic medical records appeared to have been inserted and that dates reflecting patient treatments appeared to be fictitious.

86. Pitts determined that Cognitive Research Corporation, the CRO responsible for monitoring site compliance, had failed to adequately perform its oversight responsibilities, as the foregoing issues were not reported.

87. The findings of the Pitts Audit were presented during an audit-closing meeting

held on December 29, 2022. Attendees included Site No. 145 Director Jose Marichal, NM101 Principal Investigator Dr. Carlos Martinez, clinical research coordinators, and a research associate from BioVie's CRO. The Pitts Audit concluded that study eligibility could not be confirmed due to the lack of integrity in the medical records and recommended that BioVie maintain the enrollment hold and close the site in light of the extent of the noncompliance identified.

88. Despite the serious concerns and protocol violations identified during the Pitts Audit, the underlying issues persisted into and throughout much of 2023.

89. On August 8 and 9, 2023, independent auditor GeoSera, Inc. conducted a for-cause audit at Site No. 145 (the "GeoSera Audit"), the same site that had been the subject of the Pitts Audit approximately eight months earlier. At the time of the GeoSera Audit, enrollment at the site had been completed.

90. GeoSera auditors identified three "critical" observations. Specifically, the auditors found that the demographics and signature sections of MRI reports appeared to have been modified, that multiple MRI reports contained identical assessments for different patients, and that medical records contained discrepancies in demographic information and dates. The GeoSera Audit also identified "major" observations concerning recordkeeping procedures that deviated from standard practices, including the overwriting of reports rather than the addition of supplemental reports, unsigned reports, inconsistent notes to file, and the absence of contemporaneous documentation for MRIs and other evaluations.

91. GeoSera recommended further investigation to determine the root cause of the missing data and the inability to validate data contained in patient files, and to assess whether the affected patients were eligible for inclusion in the final data analysis for the NM101 Study. The

GeoSera Audit further concluded that the CRO should have halted the Study at Site No. 145 but failed to do so despite conducting more than a dozen multi-day monitoring visits.

92. On August 31, 2022, BioVie entered into a sales agreement with Cantor Fitzgerald and B. Riley Securities pursuant to which the Company was authorized to sell shares of its stock into the open market.

93. Between December 21, 2022 and April 3, 2023, BioVie sold an additional 3.6 million shares to public investors, raising approximately $19.8 million in proceeds.

94. At no point during the Company's at-the-market offerings did BioVie disclose to investors the protocol violations and data-falsification findings identified in the Pitts Audit.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

95. Defendant Do signed BioVie's Quarterly Report on Form 10-Q for the period ended December 31, 2022 (the "2Q23 10-Q"), which the Company filed with the SEC on February 10, 2023. In discussing enrollment in the NM101 Study and the expected timeline for its completion, the 2Q23 10-Q represented, in relevant part, as follows:

> In neurodegenerative disease, the Company acquired the biopharmaceutical assets of NeurMedix, Inc. ("NeurMedix"), a privately held clinical-stage pharmaceutical company, in June 2021 (See Note 5 Related Party Transactions). The acquired assets included NE3107, a potentially selective inhibitor of inflammatory extracellular single-regulated kinase ("ERK") signaling that, based on animal studies, is believed to reduce neuroinflammation. NE3107 is a novel orally administered small molecule that is thought to inhibit inflammation-driven insulin resistance and major pathological inflammatory cascades with a novel mechanism of action. There is emerging scientific consensus that both inflammation and insulin resistance may play fundamental roles in the development of Alzheimer's Disease (AD) and Parkinson's Disease (PD), and NE3107 could, if approved, represent an entirely new medical approach to treating these devastating conditions affecting an estimated 6 million Americans suffering from AD and 1 million Americans suffering from PD. In August 2021, the Company initiated the FDA authorized potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel group, multicenter study to evaluate NE3107 in subjects who have mild to moderate

> Alzheimer's disease (NCT04669028). The Company is targeting primary completion of this study in the third quarter of calendar year 2023.
>
> The increase in research and development expenses of $1.3 million was primarily due to the Neuroscience NE3107 studies, which were significantly more active during the three months ended December 31, 2022 compared to the three months ended December 31, 2021. The Parkinson's Phase 2 study initiated in January 2022, became fully enrolled with the top-line data read reported in December 2022 and the Alzheimer Phase 3 study is approaching full enrollment. Our Orphan drug candidate BIV201's Phase 2b study, which was initiated in June 2021, accounted for approximately $100,000 of the net increase in research and development expenses for three months ended December 31, 2022.

96. In addressing risks associated with protocol and compliance violations in the NM101 Study, the 2Q23 10-Q cautioned, in relevant part, as follows:

> We depend, and will continue to depend, on contract research organizations ("CROs"), clinical trial sites and clinical trial principal investigators, contract laboratories, and other third parties to conduct our clinical trials. We rely heavily on these third parties over the course of our clinical trials, and we control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal, regulatory, and scientific standards and regulations, and our reliance on third parties does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices ("cGCPs"), which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development. Regulatory authorities enforce cGCPs through periodic inspections and for-cause inspections of clinical trial principal investigators and trial sites. If we or any of these third parties fail to comply with applicable cGCPs or fail to enroll a sufficient number of patients, we may be required to conduct additional clinical trials to support our marketing applications, which would delay the regulatory approval process. Moreover, our business may be implicated if any of these third parties violates federal, state, or foreign fraud and abuse or false claims laws and regulations or healthcare privacy and security laws, or provide us or government agencies with inaccurate, misleading, or incomplete data.
>
> Although we design the clinical trials for our product candidates, our CROs will facilitate and monitor our clinical trials. As a result, many important aspects of our clinical development programs, including site and investigator selection, and the conduct and timing and monitoring of the study, will be partly or completely outside our direct control. Our reliance on third parties to conduct clinical trials will also result in less direct control over the collection, management, and quality of data developed through clinical trials than would be the case if we were relying entirely upon our own employees. Communicating with third parties can also be

> challenging, potentially leading to mistakes as well as difficulties in coordinating activities.
>
> Any third parties conducting our clinical trials are not, and will not be, our employees and, except for remedies available to us under our agreements with these third parties, we cannot control whether they devote sufficient time and resources to our ongoing preclinical, clinical, and nonclinical programs. These third parties may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities, which could affect their performance on our behalf. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements, or if there are other difficulties with such third parties, such as staffing difficulties, changes in priorities, or financial distress, our clinical trials may be extended, delayed, or terminated. As a result, we may not be able to complete development of, obtain regulatory approval of, or successfully commercialize our product candidates. As a result, our financial results and the commercial prospects for our product candidates will be harmed, our costs could increase, and our ability to generate revenue could be delayed.
>
> If any of our relationships with trial sites, or any CRO that we may use in the future, terminates, we may not be able to timely enter into arrangements with alternative trial sites or CROs, or do so on commercially reasonable terms. Switching or adding clinical trial sites or CROs to conduct our clinical trials involves substantial cost and requires extensive management time, training, and focus. In addition, there is a natural transition lag when a new third party must learn about our product candidates and protocols, which can result in delays that may materially impact our ability to meet our desired clinical development timelines.

97. On March 2, 2023, BioVie issued a press release entitled "BioVie Announces Completion of Patient Enrollment in Phase 3 Trial Assessing NE3107 in Alzheimer's Disease," announcing that enrollment in the NM101 Study had been completed. The press release stated, in relevant part, as follows:

> CARSON CITY, Nev., March 02, 2023 (GLOBE NEWSWIRE) -- BioVie Inc. (NASDAQ: BIVI) ("BioVie" or the "Company"), a clinical-stage company developing innovative drug therapies for the treatment of neurological and neurodegenerative disorders and advanced liver disease, today announced that its NM101 trial evaluating NE3107 in the treatment of patients with Alzheimer's Disease, has achieved its revised enrollment target of 400 patients. The Company anticipates announcing top line results from the study in October 2023.

> The NM101 trial is a potentially pivotal Phase 3 randomized, double blind, placebo controlled, parallel group, multicenter study to evaluate NE3107 in patients who have mild to moderate Alzheimer's disease (NCT04669028). The study has co-primary endpoints looking at cognition using the Alzheimer's Disease Assessment Scale-Cognitive Scale (ADAS-Cog 12) and function using the Alzheimer's Disease Cooperative Study-Clinical Global Impression of Change (ADCS-CGIC).
>
> The NM101 trial protocol originally specified enrolling at least 316 patients equally randomized to treatment and placebo arms. The protocol also pre-specified the potential for a review by the data safety monitoring board (DSMB), in a manner that is blinded to the Company, when roughly 50% of the 316 enrolled patients have completed the study to determine if increasing enrollment of up to 400 patients might be desirable for the purpose of enhancing the probability of achieving statistical significance. Due to an accelerating pace of enrollment as the trial progressed, the Company enrolled 316 patients before 50% of enrolled patients had completed the study. Consequently, the Company decided to proceed to 400 patients without the pre-specified interim analysis.
>
> "We look forward to having topline data from this trial in October," said Cuong Do, BioVie's President and CEO. "We are optimistic that this trial will provide similar data to what was seen in the Phase 2 exploratory study, which showed that patients treated with NE3107 experienced enhanced cognition as measured by multiple assessment tools, including a 2.1 points improvement on the modified ADAS-Cog12 scale."

98. On March 23, 2023, BioVie filed a Current Report on Form 8-K with the SEC (the "March 23 8-K"). Attached to the March 23 8-K was an investor presentation that addressed, among other topics, the enrollment status of the NM101 Study and its progress toward the anticipated completion date. With respect to those matters, the investor presentation provided the following information:




99. In the investor presentation attached to the March 23 8-K, BioVie presented detailed information concerning data from the NM101 Study. However, the Company did not disclose the significant issues affecting that data, including that the Study dataset contained fraudulent patient data. Notwithstanding those undisclosed issues, the investor presentation represented, in relevant part, as follows:




100. On May 12, 2023, BioVie filed with the SEC its Quarterly Report on Form 10-

Q for the quarter ended March 31, 2023 (the "3Q23 10-Q"). The 3Q23 10-Q was signed on the Company's behalf by Defendant Do. In discussing enrollment in the NM101 Study and the anticipated timeline for the Study's completion, the 3Q23 10-Q stated, in relevant part, as follows:

> The Company acquired the biopharmaceutical assets of NeurMedix, Inc. ("NeurMedix"), a privately held clinical-stage pharmaceutical company, in June 2021 (See Note 5 Related Party Transactions). The acquired assets included NE3107, a potentially selective inhibitor of inflammatory extracellular single regulated kinase("ERK") signaling that, based on animal studies, is believed to reduce neuroinflammation. NE3107 is a novel orally administered small molecule that is thought to inhibit inflammation-driven insulin resistance and major pathological inflammatory cascades with a novel mechanism of action. There is emerging scientific consensus that both inflammation and insulin resistance may play fundamental roles in the development of Alzheimer's Disease (AD) and Parkinson's Disease (PD), and NE3107 could, if approved represent an entirely new medical approach to treating these devastating conditions affecting an estimated 6 million Americans suffering from AD and 1 million Americans suffering from PD. In August 2021, the Company initiated the FDA authorized potentially pivotal Phase 3 randomized, double-blind, placebo-controlled, parallel group, multicenter study to evaluate NE3107 in subjects who have mild to moderate AD (NCT04669028). The Company is targeting primary completion of this study in the fourth quarter of calendar year 2023.
>
> The increase in research and development expenses of approximately $6.7 million was primarily due to the Neuroscience NE3107 studies, which were significantly more active during the three months ended March 31, 2023, compared to the three months ended March 31, 2022. The Parkinson's Phase 2 study initiated in January 2022 reported top results and the Alzheimer Phase 3 study reached full enrollment. Our Orphan drug candidate BIV201's Phase 2b study, which was initiated in June 2021, accounted for approximately $124,000 of the net increase in research and development expenses for three months ended March 31, 2023.

101. On July 18, 2023, BioVie issued a letter to shareholders authored by Defendant Do. In that communication, Defendant Do made the following statements, in relevant part:

> Dear Shareholders,
>
> The company has made tremendous progress since I last wrote you in December, and the totality of the data we have shared lead me to be increasingly excited and optimistic about what we hope to see when our Phase 3 trial for NE3107 in Alzheimer's Disease (AD) reads out later this year. I have prepared this letter to shareholders to provide an update that synthesizes all the information that we have released and presented at recent medical conferences.

Our NM101 trial has been fully enrolled since February 2023 and is nearing its completion by the end of September. Topline data readout is expected in the October-November timeframe.
As we approach data readout, I am increasingly optimistic about what we hope to see based on the totality of the data that we have disclosed. The data described above is suggestive that NE3107 may have an active epigenetic effect associated with improvements in inflammation, insulin signaling, and other critical biological processes in a manner that is significantly correlated to improvements in cognition, AD biomarkers, and imaging endpoints. This small exploratory trial involving just 23 patients provided statistically significant data on so many measures and correlations. Assuming that epigenic changes seen in the Phase 2 trial is coming from NE3107 activity and not some placebo or random effect, one would expect the 200 patients treated with NE3107 in the NM101 trial should have dramatically different results from the 200 patients in the placebo arm on these same measures.

Additionally, the data we recently presented at the 83rd Scientific Sessions of the American Diabetes Association that took place June 23-26 give[s] further support for what we can expect. This poster presentation did not provide any results or readouts. Instead, it provided the first data on the 400 patients in the NM101 trial as they started the trial (i.e., at baseline), including:

- The large majority of patients had elevated inflammatory markers and were overweight. Large portions have some degree of metabolic dysregulation, including hypertension (61%), impaired glucose metabolism (52%), insulin resistance (47%), hypertriglyceridemia (40%) and hypercholesterolemia (30%).

- Patients who are amyloid beta positive (Aβ+) had comparable CDR-SB scores at baseline as those who are Aβ negative (Aβ-). This supports our thesis all along that Aβ cannot be the only factor driving AD or cognitive decline.

- Aβ+ patients had worse ADAS-Cog12 and MMSE scores (indicating lower cognitive functioning) than the Aβ- patients, while the Aβ- patients had significantly higher inflammation, insulin resistance, IFG, and hypertension, compared to their Aβ+ counterparts. We interpret this data to mean that metabolic factors are critical drivers of cognitive decline for everyone, and that the presence of Aβ is a contributory – but not a causal –factor for the cognitive decline.

Patients treated with NE3107 in prior trials have seen improvements in inflammation, glucose metabolism, insulin resistance, hypercholesterolemia, hypertriglyceridemia, etc. We believe the fact that patients started the trial with elevated levels of these factors provides additional cautious optimism for the NM101 trial as NE3107 has demonstrated a potential impact on these areas in previous studies.

102. On August 16, 2023, BioVie filed its Annual Report on Form 10-K for fiscal year 2023 (the "2023 10-K"). The 2023 10-K was executed by Defendants Do, Lang, Sherman, Gorlin, Hariri, and Rogich and included a certification signed by Defendant Do pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the filing. In discussing enrollment in the NM101 Study and the anticipated timeline for the Study's completion, the 2023 10-K stated, in relevant part, as follows:

> In neurodegenerative disease, the Company's drug candidate NE3107 inhibits inflammatory activation of extracellular single-regulated kinase ("ERK") and Nuclear factor kappa-light-chain-enhancer of activated B cells ("NFkB") (e.g., tumor necrosis factor ("TNF") signaling) that leads to neuroinflammation and insulin resistance, but not their homeostatic functions (e.g., insulin signaling and neuron growth and survival). Both inflammation and insulin resistance are drivers of Alzheimer's disease ("AD") and Parkinson's disease ("PD").
>
> The Company is conducting a potentially pivotal Phase 3 randomized, doubleblind, placebo-controlled, parallel-group, multicenter study to evaluate NE3107 in patients who have mild to moderate Alzheimer's disease (NCT04669028). The Company is targeting primary completion of this study in the fourth quarter of calendar year 2023.
>
> The Company is conducting a potentially pivotal Phase 3 randomized, double blind, placebo controlled, parallel group, multicenter study to evaluate NE3107 in patients who have mild to moderate AD (NCT04669028). The study has co-primary endpoints looking at cognition using the Alzheimer's Disease Assessment Scale-Cognitive Scale (ADAS-Cog 12) and function using the Alzheimer's Disease Cooperative Study-Clinical Global Impression of Change (ADCS-CGIC). The program is fully enrolled and is targeting primary completion in the fourth quarter of the calendar 2023 year.

103. The 2023 10-K also addressed the Company's compliance with regulations governing clinical trials. In discussing those compliance obligations, the filing stated, in relevant part, as follows:

> In the United States, the FDA regulates drugs under the Federal Food, Drug and Cosmetic Act, or FDCA, and implements regulations. Drugs are also subject to other federal, state and local statutes and regulations. Biologics are subject to regulation by the FDA under the FDCA, the Public Health Service Act, or the PHSA, and related regulations, and other federal, state and local statutes and

> regulations. Biological products include, among other things, viruses, therapeutic serums, vaccines and most protein products. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. Failure to comply with the applicable United States requirements at any time during the product development process, approval process or after approval, may subject an applicant to administrative or judicial sanctions. FDA sanctions could include refusal to approve pending applications, withdrawal of an approval, a clinical hold, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, restitution, disgorgement or civil or criminal penalties. Any agency or judicial enforcement action could have a material adverse effect on us.
>
> The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following: . . . Performance of adequate and well-controlled human clinical trials according to the FDA's current good clinical practices, or GCPs, to establish the safety and efficacy of the proposed drug or biologic for its intended use . . . .
>
> Clinical trials involve the administration of the drug or biological candidate to healthy volunteers or patients having the disease being studied under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety. Each protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted in accordance with the FDA's good clinical practices requirements. Further, each clinical trial must be reviewed and approved by an independent institutional review board, or IRB, at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the informed consent form that must be provided to each clinical trial subject or his or her legal representative and must monitor the clinical trial until it is completed.

104. In addressing risks arising from protocol and compliance violations in the NM101 Study, the 2023 10-K stated, in relevant part, as follows:

> We depend, and will continue to depend, on contract research organizations ("CROs"), clinical trial sites and clinical trial principal investigators, contract laboratories, and other third parties to conduct our clinical trials. We rely heavily on these third parties over the course of our clinical trials, and we control only

certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the protocol and applicable legal, does not relieve us of our regulatory responsibilities. We and these third parties are required to comply with current good clinical practices (“cGCPs”), which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for the conduct of clinical trials on product candidates in clinical development. Regulatory authorities enforce cGCPs through periodic inspections and for-cause inspections of clinical trial principal investigators and trial sites. If we or any of these third parties fail to comply with applicable cGCPs or fail to enroll a sufficient number of patients, we may be required to conduct additional clinical trials to support our marketing applications, which would delay the regulatory approval process. Moreover, our business may be implicated if any of these third parties violates federal, state, or foreign fraud and abuse or false claims laws and regulations or healthcare privacy and security laws, or provide us or government agencies with inaccurate, misleading, or incomplete data.

Although we design the clinical trials for our product candidates, our CROs will facilitate and monitor our clinical trials. As a result, many important aspects of our clinical development programs, including site and investigator selection, and the conduct and timing and monitoring of the study, will be partly or completely outside our direct control. Our reliance on third parties to conduct clinical trials will also result in less direct control over the collection, management, and quality of data developed through clinical trials than would be the case if we were relying entirely upon our own employees. Communicating with third parties can also be challenging, potentially leading to mistakes as well as difficulties in coordinating activities.

Any third parties conducting our clinical trials are not, and will not be, our employees and, except for remedies available to us under our agreements with these third parties, we cannot control whether they devote sufficient time and resources to our ongoing preclinical, clinical, and nonclinical programs. These third parties may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities, which could affect their performance on our behalf. If these third parties do not successfully carry out their contractual duties or obligations or meet expected deadlines, if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements, or if there are other difficulties with such third parties, such as staffing difficulties, changes in priorities, or financial distress, our clinical trials may be extended, delayed, or terminated. As a result, we may not be able to complete development of, obtain regulatory approval of, or successfully commercialize our product candidates. As a result, our financial results and the commercial prospects for our product candidates will be harmed, our costs could increase, and our ability to generate revenue could be delayed.

If any of our relationships with trial sites, or any CRO that we may use in the future,

> terminates, we may not be able to timely enter into arrangements with alternative trial sites or CROs, or do so on commercially reasonable terms. Switching or adding clinical trial sites or CROs to conduct our clinical trials involves substantial cost and requires extensive management time, training, and focus. In addition, there is a natural transition lag when a new third party must learn about our product candidates and protocols, which can result in delays that may materially impact our ability to meet our desired clinical development timelines.

105. The 2023 10-K further discussed the conduct and oversight of clinical trials. In connection with those matters, the filing represented, in relevant part, as follows:

> The process of obtaining FDA approval is costly and time consuming. Current FDA requirements for a new human drug or biological product to be marketed in the United States include, among other things: (a) the successful conclusion of pre-clinical laboratory and animal tests, if appropriate, to gain preliminary information on the product's safety; (b) filing with the FDA of an IND application to conduct human clinical trials for drugs or biologics; (c) the successful completion of adequate and well-controlled human clinical investigations to establish the safety and efficacy of the product for its recommended use; and (d) filing by a company and acceptance and approval by the FDA of a NDA for a drug product or a BLA for a biological product to allow commercial distribution of the drug or biologic. A delay in one or more of the procedural steps outlined above could be harmful to us in terms of getting our product candidates through clinical testing and to market, which could have a materially adverse effect on our business.
>
> * * *
>
> Even if we are successful in developing BIV201 and NE3107, our product candidates, we have limited experience in conducting or supervising clinical trials that must be performed to obtain data to submit in concert with applications for approval by the FDA. The regulatory process to obtain approval for drugs for commercial sale involves numerous steps. Drugs are subjected to clinical trials that allow development of case studies to examine safety, efficacy, and other issues to ensure that sale of drugs meets the requirements set forth by various governmental agencies, including the FDA. In the event that our protocols do not meet standards set forth by the FDA, or that our data is not sufficient to allow such trials to validate our drugs in the face of such examination, we might not be able to meet the requirements that allow our drugs to be approved for sale which could have a materially adverse effect on our business.

106. On September 8, 2023, BioVie filed a Current Report on Form 8-K with the SEC that included an attached investor presentation. In that presentation, the Company provided an update regarding the enrollment status of the NM101 Study and its progress toward the projected

completion date. With respect to those matters, the investor presentation represented the following:




107. On October 25, 2023, BioVie issued a press release announcing data from the Phase 3 NM101 clinical trial. In that press release, the Company described the NM101 Study results and stated, in relevant part, as follows:

> Carson City NV, October 25, 2023 – BioVie Inc., (NASDAQ: BIVI) ("BioVie" or the "Company") a clinical-stage company developing innovative drug therapies for the treatment of advanced liver disease and neurological and neurodegenerative disorders, announced that blinded data on cognitive, biomarker and imaging findings from the recently completed Phase 3 clinical trial (NCT04669028) of NE3107 in the treatment of mild to moderate Alzheimer's Disease (AD) were presented today as an oral presentation at the 16th Clinical Trials on Alzheimer's Disease (CTAD) in Boston, MA.
>
> The presentation, Clinical Outcomes from a Phase 3, Randomized, Placebo-Controlled Trial of NE3107 in Subjects with Mild to Moderate Probable Alzheimer's Disease, detailed a cross sectional analysis of blinded data from BioVie's Phase 3 study and discussed participants whose data were available for analysis as of October 18, 2023 (n=322). These preliminary analyses will be updated once the complete and final dataset becomes available and when the study database is locked, unblinded and analyzed in full.
>
> The blinded data presented suggest that NE3107 is a biologically active compound exerting potential effects as observed by biomarker, imaging, cognitive and functional assessments. Population changes from baseline were observed, with some patients demonstrating an improvement after 30 weeks of treatment with the

> double blinded oral study drug (NE3107 or matched placebo) as compared to baseline, while many were also observed to have worsened, which is consistent with the natural progression of the disease (Figure 1).
>
> “The blinded data presented at CTAD show encouraging changes from baseline that would not typically be seen without a treatment effect, which provides us with confidence that NE3107 may show a clear benefit over placebo when the data from this trial is unblinded in the coming weeks,” commented Joseph Palumbo, BioVie’s Chief Medical Officer. “We believe NE3107 has the potential become to effective multi-mechanistic treatment for Alzheimer's that is safe and can be orally administered.”

108. On November 1, 2023, BioVie conducted a conference call with analysts and investors to discuss the NM101 Study. During the opening portion of the call, Defendant Do addressed participants and stated, in relevant part, as follows:

> So we presented the data that we had as of October 18 from roughly 322 subjects, whose data were verified or in the process of being verified and cleaned as of this date.
>
> * * *
>
> And in looking at the totality of the data, we conclude that any NE3107 appears to be biologically active and that it appears to be having an impact on the cognitive biomarkers and end-to-end points that we’ve looked at in the trial.
>
> * * *
>
> And as we look at this pattern, we see great -- we have some optimism that there is an effect, a drug effect going on. We need to make that comment because if there were not a drug effect, you would expect all the subjects to be clumped together.
>
> And that would be roughly around the no-change line or it's somewhat worsening, somewhat getting better if there's a learning or a placebo effect.
>
> But the fact that we see a pattern of maybe people getting better and many people getting worse, which suggests to us that there is something going on beyond just a group, the drug that not working. You would not see a lot of people getting a lot better if there is not something going on here, right? And the magnitude of the clinical getting better from this blinded data is a little too large from what you would expect from just a placebo effect.

109. Also during the call, Defendant Palumbo stated the following, in relevant part:

> So [the results tell] that we've captured the right individuals for this study. It shows that in the course of only six months, who started out as negative shift, towards positive, it gives us a good look at the sensitivity of this study. And that --and remember, half of these folks are on drug and half are on placebo.
>
> So for me, this is a signal I was looking for in the midst of COVID, in the midst of everything else. Did we capture the right patients and would they progress as expected, right? And you wouldn't necessarily see this in a study that was only looking at positive patients at baseline. Now the data and positivity is great, of course, that we have people who shift towards this negative status, and that is absolutely exciting.
>
> Also, this validation study is long enough, at least to me, in looking at the shift from negative to positive in a six-month basis of the study. And so I'm actually very happy with that. And that was all I really wanted to say, Cuong.

110. During a question-and-answer portion of the call, Defendant Do stated:

> So with that, I know that we have over time here, let me close the call by saying that we are cautiously optimistic when looking at the totality of the data, right? And I do not believe you can look at any one particular measure to say things are working or not working, you have to look at the totality of the data.
>
> And the totality of the data here would suggest that NE3107 appears to have an underlying biological effect and that biological effect appears to be having an impact on the cognitive, functional, biomarker and imaging endpoints that we are looking at in this trial.
>
> So we are cautiously optimistic that when we unblind the data after Thanksgiving or early December, that this could potentially lead to a significant improvement, a significant new tool for the community to treat Alzheimer's disease when it's fully registered.

111. The statements set forth above were materially false and misleading when made and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically, statements describing NE3107 and the NM101 Study as "fully enrolled" failed to disclose that findings from the Pitts Audit, and later the GeoSera Audit, gave reason to doubt whether patients enrolled at Site No. 145 should have been included in the Study at all. In reality, the Study was not "approaching full enrollment" in accordance with the Study protocol. As later revealed, BioVie had enrolled a material number of

patients who should not have been enrolled, thereby contradicting the publicly stated number of enrolled patients and/or the reported status of patient enrollment in the NM101 Study. Moreover, the Pitts Audit and the GeoSera Audit confirmed that patients enrolled in the trial did not meet the eligibility criteria under the Study protocol and/or that patient data failed to confirm their eligibility for the Study.

112. The Individual Defendants' statements and omissions regarding the anticipated timing of data collection and the release of topline Study data were materially false and misleading when made because they omitted material facts. Specifically, those statements conveyed the materially false impression that the NM101 Study was progressing in accordance with the Study protocol and without material issues affecting its timeline. In truth, the Individual Defendants concealed delays that would inevitably result from the patient fraud and data-integrity issues identified in the Pitts Audit and the GeoSera Audit. Once the fraudulent data and/or ineligible patients were excluded from the trial, the NM101 Study would no longer be sufficiently "powered" under the Study protocol. Consequently, the Study would require either additional enrollment or the initiation of a new trial.

113. The Individual Defendants also made materially false and misleading statements, and omitted material facts, when conveying objective conclusions regarding blinded data. Throughout the Relevant Period, the Individual Defendants provided detailed descriptions of data from the NM101 Study without disclosing the data-integrity issues affecting that data, including that fraudulent patient data was likely included in the Study. For example, although "baseline data" may have demonstrated "evidence of metabolic inflammation" in certain subjects, BioVie failed to disclose that a material number of patients included in the NM101 Study data were either ineligible for participation in the Study or lacked proper underlying data confirming their

eligibility. Consequently, the Individual Defendants' descriptions of the Study data materially misled investors regarding the strength of that data and/or its ability to maintain the NM101 Study at the "power" level required under the Study protocol.

**THE TRUTH BEGINS TO EMERGE**

114. On November 8, 2023, BioVie filed the 1Q24 10-Q with the SEC. In the 1Q24 10-Q, the Company disclosed the following, in relevant part:

> [D]uring routine monitoring of blinded data from our Phase 3 study (NCT04669028) of NE3107, we uncovered what appears to be potential scientific misconduct and significant non-compliance with GCPs and regulation at six sites. We have alerted the FDA's Office of Scientific Integrity ("OSI") about these issues and believe OSI will perform a thorough, competent, objective and fair research of any potential scientific misconduct and non-compliance of GCPs and regulation.
>
> Sensitivity analysis excluding data from these six problematic sites has been performed and accounted for in the statistical analysis plan for the study (NCT04669028). Nonetheless, these findings of potential scientific misconduct and significant GCP violations may call into question the rigor, robustness and validity of the entire data set for this study (NCT04669028) and may require additional clinical studies to confirm the final results of the study.

115. On November 9, 2023, BioVie's stock price declined to a low of $2.31 per share, compared to its closing price of $4.26 per share on the preceding trading day.

116. On November 29, 2023, BioVie filed a Current Report on Form 8-K (the "November 29 8-K"), to which the Company attached a press release and an investor presentation. The press release disclosed, in relevant part, the following:

> The trial started during the COVID-19 pandemic when access to clinical sites was limited and enrolled a total of 439 patients through 39 sites. Upon trial completion, the Company found significant deviation from protocol and Good Clinical Practice (GCP) violations at 15 sites (virtually all of which were from one geographic area). This highly unusual level of suspected improprieties led the Company to exclude all patients from these sites and to refer them to the U.S. Food and Drug Administration (FDA) Office of Scientific Investigations (OSI) for further action. After these exclusions, 81 patients remained in our Modified Intent to Treat (MITT) population, 57 of whom were in the Per-Protocol population which included those who completed the trial and were verified to take study drug from Pharmacokinetic

(PK) data.

117. Attached to the investor presentation was additional information regarding the "significant deviation from protocol" referenced in the press release. Specifically, the investor presentation provided the following details:

- The Company monitors blinded data to track safety and ensure timely data entry into the EDC
- The company started noticing unusual data patterns when enough patients completed the trial. Pentara (a leading AD biostatistics firm) reviewed the blinded data and found:
    - Several sites had anomalous data (e.g. inconsistent patterns compared to historical data, large proportions of patients improving compared to baseline, unusual variability patterns)
    - All patients in a particular demographic group enrolled in this trial showed a data pattern not explainable based on disease progression and which substantially deviated from historical data far this demographic in other AD trials
    - Without unblinding and PK data, there was no way to identify the cause. Clear subgroup analyses identified: anomalous sites vs. other sites; identified demographic group vs. all others
- In parallel, BioVie had the first opportunity to start the data review process as sites started to finish patient-facing activities in early summer 2023
    - Noticed deviations from expectations (e.g. data patterns, missing data, copied/pasted MRI results, etc.)
- CROs identified six sites with numerous and significant procedural deviations, which led us to:
    - Updated SAP to 1) exclude all patients from affected sites; and 2) prespecify a series of subgroup analyses
    - Amended our protocol: 1) Finalize CDR-SB and ADAS-Cog12 as primary endpoints based on prior FDA communications; 2) Created "adaptive trial" design
    - Reported the 6 sites to the FDA's Office of Scientific Investigations

- As data was unblinded, anomalous data from the identified demographic group was confirmed to be scientifically improbable. Furthermore, all patients in this demographic were associated with the previously identified anomalous sites, and virtually all of which were concentrated in a single geographic area. Accordingly, these sites were also excluded per our SAP and additionally referred to the FDA.

118. The investor presentation also stated that "Unanticipated exclusion of sites due to deviations led to study being underpowered. Adaptive feature of trial allows the Company to continue enrolling patients to reach statistical significance."

119. Also on November 29, 2023, BioVie conducted a conference call led by Defendants Do and Palumbo, together with the CEO of Pentara Corporation. During the call, Defendant Do stated that the NM101 Study "did not achieve statistical significance because we had to exclude so many patients from the trials that we believe engaged in improper practices." Defendant Do further disclosed that BioVie had excluded 358 patients, representing "over 80% of our enrolled populations due to suspected improper conduct at 15 clinical sites," and stated that "all of these clinical sites had been referred to the FDA."

120. Defendant Do further acknowledged that the conduct identified at the affected clinical sites was "so unusual." During the same discussion, Defendant Do explained that each clinical site was responsible for uploading patient data to an electronic database known as the "EDC," which was maintained by the CRO, and that BioVie possessed only read access to blinded data within that system. Defendant Do also stated that the Company "monitors blinded data on an ongoing basis to review safety and ensure that data is entered on a timely basis into the EDC."

121. Addressing the exclusion of six clinical sites from the Study, Defendant Do stated as follows:

> In parallel, patient facing activities started to wrap up at some of the sites in July of 2023, which provided us the first opportunity to conduct a detailed data review and validation….that is when we started to notice higher than expected levels of

> deviations….that is when we made the decision to undertake a multi-step review process that involved hiring a supplemental CRO to conduct quality control visits to all sites and then to conduct source data verification or SDV on 100 percent of the materials touched in the clinical sites. Subsequently, a third CRO was hired to audit sites as well. We took this level of proactive actions and diligence that goes way above what is typically done by pharma companies because we understood the importance of this data. We finally received the final QC reports from the supplemental CRO on November 6th, which revealed that six sites that enrolled 128 patients had what appeared to be numerous and significant GCP violations and deviations from our protocol. The deviations were to such an extent that we had to act.
>
> * * *
>
> [W]hen we saw this problem we acted rapidly and vigorously, rather than ignore it because we could not condone the practices we uncovered, such as when multiple patients came in for an MRI scan on the same day they ended up having the same result posted with their records…as a result we did the following: first we updated our statistical analysis plan or SAP to exclude all data from these six deviating sites because the patients and their data were totally suspect. Second, we amended our protocol with the FDA to do two things – first is that we finalize the primary endpoints to be CDR-SB and ADAS-Cog. This was a planned activity as a result of our interaction with the FDA over months…the second thing is that we revised the clinical trial design itself to be an adaptive design so that we may work with the FDA to potentially continue enrolling additional patients if we see an efficacy signal but miss on stats due to the excluded sites. And the third thing we did was referred all six sites to the FDA's Office of Scientific Investigations three days after receiving the CRO's report…. on November the 9th.

122. With respect to the remaining nine sites excluded from the Study, Defendant Do offered the following explanation:

> When we started unblinding the data, we focused first on the sub-group analyses that Pantera recommended, right, and we found that the anomalous data from the patients from the identified demographic groups could not be explained scientifically. The placebo patients are not expected to significantly and dramatically improve as we saw in the data from this demographic group. The same thing was found regarding the anomalous sites. And, in fact, the problem identified with the demographic group and the anomalous sites turned out to be one and of the same in that virtually all patients from the demographic group were associated with the anomalous sites, which were all located in one geographic area. Thus, we had to exclude these nine sites that enrolled a total of 230 patients as well per our pre-specified SAP. Since virtually all of the now 15 sites suspected of improprieties were in a single geographic area, we suspect that there may be more going on; thus, we referred all 15 sites to the FDA. And since we have a deep respect for the FDA

> and their investigative processes we are not identifying the geographic area and sites and we have not notified any of the sites as to their status… by excluding 358 patients or over 80% of our enrollment we were left with 81 patients in our modified intent to treat population. This also meant that we only had 57 in the per protocol populations, which are patients who have completed the trial, patients who we can verify have taken the study drug through PK, and so forth.

123. Defendant Do further stated as follows:

> So the natural question is how could this have happened? That is a great question and I wish I had a simple, great answer for you. But, I believe there are a few confounding factors that got us here. First, we started enrolling the trial at the height of the COVID-19 pandemic, where there was limited access to the sites. In fact, the limited access remained the case for most of the duration of the trial. We rely on third-parties to execute and monitor the trials so one could say the on the ground oversight of the sights [sic] was not what it needed to be. Second, we assumed good intent. There are nearly 500,000 clinical sites registered in clinicaltrials.gov, all of whom are licensed. They have to adhere to GCP, and they are periodically audited by the FDA and other agencies. We presumed that our clinical sites would act responsibly, but we found ourselves victim of suspected coordinated improprieties at a level that none of us have seen in our careers. It's just so unusual. There's just no other way of describing it.

124. During the question-and-answer session of the November 29, 2023 conference call, Defendant Do made the following acknowledgment:

> What's very very clear to us here is that monitoring, on-site monitoring of what was going on was not where it needed to be, right, and so frankly one of the things we will do is what I have done for my other clinical trials in Asia for example, is we are going to take a belt-and-suspenders approach, right? In those trials I always have my own CRAs alongside the CRO's monitors out at the sites, right, and we are essentially going to go with more established sites that have conducted more of these Alzheimer trials, and frankly we have changed our CRO. And so those are some of the things that we will be doing immediately and we will be working…to identify the other safeguards that we need to put in place – along with the FDA – I think the FDA will have a point of view kind of given the bit of a scandal that we have here with these sites.

125. Defendant Do also participated in the following exchange with an analyst regarding the "big picture":

> *Analyst*: What gives you confidence, excluding these patients, that the data holds, and what would motivate a region, not just one clinical trial site to actually, you know, not run the trial the way it is designed? Like what really happened?

> *Defendant Do*: I don't want to start any conspiracy theories or anything else like that. And it's actually the vast majority or virtually all of 15 sites are in the same geographic area, right, and that is the reason why we have referred this thing on to the FDA to investigate because we would be just speculating, right? We do know in certain other disease that there is phenomena [of] professional patients that may be part of what is going on here but I am not going to speculate anything else.

126. Rather than disclose that he and the Company had received reports of fraudulent data as early as December 2022, Defendant Do represented to analysts and investors that BioVie only "started to notice higher than expected levels of deviations" in the data in July 2023. Defendant Do further stated that the Company "acted rapidly and vigorously, rather than ignore it because we could not condone the practices [they] uncovered, such as when multiple patients came in for an MRI scan on the same day they ended up having the same result posted with their records."

127. Following this disclosure, the price of BioVie's common stock declined by more than 60%, falling from a closing price of $4.99 per share on November 28, 2023, to a closing price of $1.96 per share on November 29, 2023.

## INSIDER SELLING

128. Rather than disclose material information to the market, Defendant Gorlin (the "Insider Selling Defendant") used his access to BioVie's material nonpublic information to sell his personal holdings while the Company's stock remained artificially inflated. As a director, the Insider Selling Defendant was entrusted with, and had access to, material, nonpublic information concerning BioVie's true business prospects.

129. While in possession of material nonpublic information, Defendant Gorlin sold 8,560 shares of his personally held BioVie stock for proceeds of $26,108 before the truth emerged. These sales were timed to capitalize on BioVie's artificially inflated stock price.

130. In total, the Insider Selling Defendant sold more than $26,000 worth of BioVie

stock at artificially inflated prices, while in possession of material, nonpublic information.

**DAMAGES TO BIOVIE**

131. As a direct and proximate result of the Individual Defendants' misconduct, BioVie has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

132. Such expenditures include, but are not limited to, legal fees associated with the Securities Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133. These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

134. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

135. As a direct and proximate result of the Individual Defendants' actions, BioVie has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

136. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

137. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

138. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

139. On February 19, 2026, Plaintiff, acting through counsel, sent a Demand to the Board, asserting that it investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors. *See* Exhibit A.

140. Having received no response, on March 10, 2026, counsel for Plaintiff sent an email to BioVie following up Plaintiff's Demand. *See* Exhibit B.

141. On March 11, 2026, BioVie responded, through counsel, requesting proof of Plaintiff's "current BioVie stock ownership, as well as his continuous ownership since the alleged misconduct." *See* Exhibit C.

142. On March 24, 2026, Plaintiff, acting through counsel, provided BioVie with current proof of ownership of BioVie stock, as well as proof of ownership of stock during the Relevant Period. *See* Exhibit D.

143. On May 5, 2026, BioVie responded, through counsel, stating that because Plaintiff owned 444 shares of BioVie common stock in December of 2022 and 5 shares of BioVie common stock in February of 2026, that Plaintiff had not demonstrated continuous ownership necessary to show standing to bring a shareholder derivative suit. BioVie's response claimed that "the materials [Plaintiff] sent do not show whether [Plaintiff] maintained his BioVie stock ownership

continuously between December 2022 and February 2026, or whether he fully divested at some intermediate point and later purchased a few shares." *See* Exhibit E.

144. As explained in Plaintiff's Demand, follow-up communications with the Company, and herein, Plaintiff is a current shareholder of BioVie and has been at all relevant times, a shareholder of BioVie. Any difference in the number of shares of BioVie common stock that Plaintiff owned between December of 2022 and February of 2026 is more than accounted for by the two 1-for-10 reverse stock splits BioVie common stock underwent on August 6, 2024 and July 7, 2025, respectively.

145. As of the date of this filing, Plaintiff has not received a substantive response to the Demand and demand in this case has therefore been constructively refused.

## CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants For Breach of Fiduciary Duties

146. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

147. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BioVie's business and affairs.

148. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties

to protect the rights and interests of BioVie.

149. In breach of their fiduciary duties owed to BioVie, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

150. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BioVie's securities.

151. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BioVie's securities.

152. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

153. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BioVie has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

154. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

**COUNT II**

**Violations of Section 14(a) of the Exchange Act**
**Against the Director Defendants**

155. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

157. Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

158. Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Proxy Statements filed with the SEC on September 30, 2022 and September 29, 2023 (collectively, the "Proxies"). Specifically, the Proxies contained false statements and/or failed to disclose critical information about: (i) the number of patients enrolled in the NM101 Study; (ii) the anticipated timing of the Study's primary completion; (iii) expressions of optimism regarding blinded data; and (iv) risks associated with the clinical-trial

process.

159. The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

160. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

161. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants**
**For Unjust Enrichment**

162. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

163. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BioVie.

164. Each of the Individual Defendants received payment from BioVie, in the form of either salary or director fees while actively breaching their fiduciary duties to BioVie.

165. All the payments and benefits provided to the Individual Defendants were at the expense of BioVie. The Company received no benefit from these payments.

166. Plaintiff, as a shareholder and a representative of BioVie, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

167. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants For Waste of Corporate Assets

168. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

169. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused BioVie to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

170. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

171. Plaintiff, on behalf of BioVie, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that Plaintiff may maintain this action on behalf of BioVie and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BioVie;

c) Determining and awarding to BioVie the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of

the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve BioVie's corporate governance and internal procedures to comply with applicable laws and to protect BioVie and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: October 26, 2026

THE O'MARA LAW FIRM, P.C.

/s/ David C. O'Mara

DAVID C. O'MARA, ESQ.
311 E. Liberty Street
Reno, Nevada 89501
775.323.1321
david@omaralaw.net

**KUEHN LAW, PLLC**
Justin A. Kuehn
Molly J. Brown
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672.0814
justin@kuehn.law
molly@kuehn.law

*Attorneys for Plaintiff*

## VERIFICATION

I, Arthur Padilla, am a plaintiff in the within action. I have reviewed the allegations made in the Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. To those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and, for that reason, believe them to be true. I declare, under penalty of perjury, that the foregoing is true and correct.

Arthur Padilla